**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 1:09-CR-408** |
| | ) | **The Hon. Anthony J. Trenga** |
| **HUNG TAN LAM,** | ) | **Sentencing Date: April 2, 2010** |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S POSITION WITH REGARD TO SENTENCING FACTORS

Pursuant to Rule 32 of the Federal Rules of Criminal Procedure, Section 6A1.3 of the United States Sentencing Guidelines ("the Guidelines" or "U.S.S.G."), and this Court's Policy Regarding Procedures to be Followed in Sentencing, the defendant, Hung Tan Lam, through counsel, states that he has received and reviewed the Presentence Investigation Report ("PSR") prepared in this case and submits the following corrections, objections, and argument.

### FACTUAL CORRECTIONS

Mr. Lam has no factual corrections to the PSR.[1]

### OBJECTIONS TO THE SENTENCING GUIDELINES COMPUTATIONS

Mr. Lam has no objections to the Guidelines computation contained in the PSR.

---

[1] Although Mr. Lam has no factual corrections to the PSR, he is unable at this time, given his ongoing confidential cooperation against others, to confirm or deny certain factual assertions in the PSR made by one of his co-conspirators, Mr. Hoang V. Pham. Specifically, given his ongoing cooperation, Mr. Lam neither confirms nor denies paragraphs 21-24, 28-29 and 32-39 of the PSR. *See* PSR at A-2.

PRELIMINARY STATEMENT

Mr. Lam accepts responsibility for his criminal conduct.  In determining an appropriate sentence, Mr. Lam respectfully requests that the Court consider all aspects of his life experience.  Mr. Lam submits that his often-troubled immigrant life experience and the difficult circumstances in which he came to this country weigh in favor of a slightly below-Guidelines sentence of no more than 120 months or, alternatively, no more than a low-end sentence of 141 months.[2]  As detailed herein and in the attached report of Dr. Paul Leung, a clinical psychologist who examined Mr. Lam and members of his family, Mr. Lam has for many years suffered from drug addiction, depression, and low self-esteem – all of which are directly related to his problematic transition into American society as a non-English speaking adolescent and which contributed to his criminal conduct.  *See* Exhibit A, Dr. Paul Leung, Mental Health Evaluation of Hung Tan Lam (hereinafter "Leung Rpt."); Exhibit B, Curriculum Vitae of Dr. Paul Leung.[3]

In 1985, when Mr. Lam was 10 years old, he and his family legally immigrated from Vietnam to the United States.  PSR ¶ 82, 83; Leung Rpt. at 2.  At the time he arrived in this country, Mr. Lam did not speak any English.  He struggled in school, had no peers

_____

[2] The government does not oppose a sentence at the low-end of the Guidelines range, *see* Plea Agreement ¶ 5, which would be 57 months for Count 1 (conspiracy) and 84 months for Count 2 (firearm).  The 84 months is a mandatory minimum.  A 120 month sentence could be achieved by imposing 36 months imprisonment for Count 1 and 84 months consecutive for Count 2.

[3] Dr. Leung's report has been filed under seal because it describes sensitive and private medical and marital information.

with whom he could identify, and his family lived in poor, cramped apartments.  Leung

Rpt. at 3.  His parents – who were also struggling to learn English and assimilate into

American culture – could not even speak to his teachers, held low-level jobs, and had no

ability to understand the difficulties he faced as a young adolescent.  Leung Rpt. at 7.  Mr.

Lam came from a culture that valued success, yet in his mind he was a failure at school,

making friends, and even speaking to those around him.  Mr. Lam's sense of failure only

grew during his 20s when he could not obtain stable employment and his wife established

herself as a successful business woman and the family's breadwinner.  PSR ¶ 89; Leung

Rpt. at 9.

Mr. Lam attempted to alleviate his depression and low sense of self-worth by

taking refuge in drugs and by associating with other disaffected Vietnamese males who

provided Mr. Lam with a sense that he belonged and was deserving of respect – qualities

that were lacking from his experience growing up and in his home life.  PSR ¶ 84; Leung

Rpt. at 8-9. Unfortunately, these individuals also reinforced in Mr. Lam a belief that drug

use and criminal conduct were acceptable and part of belonging to a group.  Leung Rpt. at

8-9.

Contrary to the government's assertion in its sentencing memorandum, Mr. Lam

does not believe that his background or drug use excuses his conduct.  *Compare* Exhibit

D, Letter of Hung Tan Lam (explaining drug use and stating "this is not to make excuses

for myself but to express how deeply sorry I am for my action"), *with* Position of the

United States With Respect to Sentencing Factors at 2 (characterizing Mr. Lam's admission of drug use as an excuse for his criminal conduct). However, for the reasons set forth below, he respectfully submits that the Guidelines do not adequately account for the circumstances surrounding his conduct and his potential to become a productive member of society.

## PROCEDURAL AND LEGAL BACKGROUND

On January 7, 2010, Mr. Lam pled guilty to (1) one count of conspiracy to affect commerce by robbery, in violation 18 U.S.C. § 1951, a Class C felony, and (2) one count of using a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) and 2, a Class A felony. The maximum penalties for Count 1 are a term of imprisonment of twenty (20) years, a fine of $250,000, restitution,[4] a special assessment and three (3) years of supervised release. The maximum penalties for Count 2 are a mandatory minimum (consecutive) term of imprisonment of seven (7) years, a maximum term of life imprisonment, a fine of $250,000, restitution, a special assessment, and five (5) years of supervised release. The PSR indicates that the advisory Guidelines range for Mr. Lam for both offenses is 141 to 155 months of imprisonment. The government has no objection to a sentence at the low end of this range. *See* Plea Agreement ¶ 5.

---

[4] Mr. Lam has agreed to the entry of a Restitution Order for the full amount of the victims' losses, to be paid jointly and severally with any co-defendants or co-conspirators who are ordered to pay restitution for the losses. *See* PSR ¶ 7.

After *Gall v. United States*, 128 S. Ct. 586 (2007), the Guidelines are truly advisory. Rejecting the government's argument that sentences significantly outside the advisory Guidelines range should be subject to exacting scrutiny on appeal, the Supreme Court in *Gall* stressed that "the Guidelines are only one of the factors to be considered when imposing sentence . . . ." *Id*. at 602. As the Court explained, the advisory Guidelines sentencing range is only "the starting point and the initial benchmark" from which sentencing courts should begin to make their sentencing determinations. *Id*. at 596. In addition to the advisory Guidelines range, courts must consider the six other (co-equal) sentencing factors enumerated in 18 U.S.C. § 3553(a) in determining the appropriate sentence in each case. *See United States v. Booker*, 543 U.S. 220, 259-60 (2005).

The overriding principle and basic mandate of Section 3553(a) requires district courts to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth therein. Upon consideration of the § 3553(a) factors, and the "sufficient but not greater than necessary" requirement, a sentencing court may find that a case falls outside the "heartland" contemplated by the Guidelines, or that "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations," or that "the case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338, 351 (2007). While the district court must begin its analysis by correctly calculating the advisory Guidelines range, the district court is then free, in light of the other statutory sentencing factors, to impose an entirely different sentence. Under *Rita*, a sentencing

-5-

court is free simply to disagree, based on the Section 3553(a) factors, with the Guidelines' "rough approximation" of the appropriate sentence for any given case. *Id*. at 350.

There is no presumption that the advisory Guidelines range is the minimally-sufficient sentence needed to satisfy Section 3553(a). *See Gall*, 128 S. Ct. at 596-97 (stating that the sentencing court "may not presume that the Guidelines range is reasonable [but must] make an individualized assessment based on the facts presented") (internal citation omitted); *see also Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007) (stating that the Guidelines are simply an advisory tool to be considered alongside other statutory considerations spelled out in 18 U.S.C. § 3553(a)).  Indeed, whatever sentence a district court imposes after appropriately considering the statutory sentencing factors, "whether inside, just outside, or significantly outside the Guidelines range," must be reviewed by the Court of Appeals under a "deferential abuse-of-discretion standard." *Gall*, 128 S. Ct. at 591 (reversing Court of Appeals and reinstating probationary sentence where advisory Guidelines range was 30-37 months).

Finally, in two summary reversals last year, the Supreme Court expressed in no uncertain terms that the Guidelines cannot be used as a substitute for a sentencing court's independent determination of an appropriate sentence based upon consideration of the Section 3553(a) factors. *See Nelson v. United States*, 129 S. Ct. 890 (2009) (per curiam); *Spears v. United States*, 129 S. Ct. 840 (2009) (per curiam).  As the Court stated in Nelson, "[o]ur cases do not allow a sentencing court to presume that a sentence within the

Guidelines is reasonable." 129 S. Ct. at 892. "The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Id.* (emphasis in original). In other words, sentencing courts commit legal error by treating the Guidelines range as a default sentence that will be imposed absent a compelling reason to sentence outside that range.

SENTENCING ARGUMENT

I.    <u>A Sentence Of No More Than 120 Months Is Sufficient To Satisfy The Statutory Purposes Of Sentencing Under 18 U.S.C. § 3553(a)</u>.

Mr. Lam respectfully submits that no more than a 120-month sentence is sufficient to promote the purposes of sentencing set forth in 18 U.S.C. § 3553.[5] Section 3553 requires that the Court consider a range of factors, including (a) the nature and circumstances of the offense, (b) the history and characteristics of the defendant, and (c) the four purposes of sentencing set forth in section 3553(a)(2). These factors are discussed below in turn.

A.    <u>Nature and Circumstances of the Offenses</u>.

Beginning in approximately October 2004, Mr. Lam conspired with others to commit robberies of homes of Asian-American business owners. Mr. Lam has admitted to participating in three robberies and providing the targeting information for a fourth

---

[5] Alternatively, Mr. Lam submits that a low-end sentence of 141 months would satisfy the purposes of sentencing set forth in section 3553. The government does not oppose a low-end sentence. *See* Plea Agreement ¶ 5.

robbery in furtherance of this conspiracy.  Statement of Facts ("SOF") ¶¶ 5-8.  During these robberies, Mr. Lam and other members of the conspiracy were armed with firearms and displayed these firearms in order to gain entry into the houses and subdue their victims.  *Id.* ¶ 4.  Mr. Lam and his co-conspirators restrained the occupants of the homes with duct tape or plastic ties and, in some cases, damaged property inside the homes.  *Id.* ¶ 6.  One of the co-conspirators would stand guard over the victims while the others searched the home for money or other valuable possessions.  *Id.* ¶ 3, 5-8.

Mr. Lam admits that his conduct in furtherance of the conspiracy was serious and warrants punishment.  Several aspects of his conduct are of note in determining an appropriate sentence.  First, there is no evidence that any of the victims were physically harmed during the robberies.[6]  Second, the robberies were of limited duration, typically lasting thirty minutes or less.  This is not a case where occupants of a home were held hostage for many hours on end.  Third, Mr. Lam was not the leader of the conspiracy.  As noted in the PSR, the conspiracy did not have a defined leader or an organized structure.  *See* PSR ¶ 57.  Finally, the value of the items stolen during the four robberies described in the indictment was relatively limited.  Indeed, the conspirators did not take any money or goods from one of the four houses.  SOF ¶ 7.  The combined value of the money and

---

[6] The government agrees that the Guidelines enhancement for bodily injury to the victims (U.S.S.G. § 2B3.1(b)(3)) does not apply in this case.  PSR ¶ 5.C.

items stolen from all the houses was $22,914.  PSR ¶ 54.  Mr. Lam has agreed to pay

restitution to the victims for their losses.  PSR ¶ 7.

> B.    History and Characteristics of Mr. Lam.

Mr. Lam submits that his conduct should be viewed in context of his life

experience – especially his struggle to integrate into American society as a non-English

speaking adolescent and his severe drug addiction and depression.  Mr. Lam was born in

Chau Doc, Vietnam, on February 24, 1975, during the Vietnam war and shortly before the

fall of Saigon.  PSR ¶ 82; Leung Rpt. at 6-7.  He is the family's first-born son and the

oldest child.  He has one younger brother and three younger sisters.  After American

forces departed Vietnam, communist authorities from North Vietnam interrogated and

terrorized Mr. Lam's family because Mr. Lam's aunt had worked as an interpreter in the

United States' embassy.  PSR ¶ 86-87; Leung Rpt. at 6.  They also looted his family's

house and, after the communists took control of Chau Doc, his parents struggled to

provide Mr. Lam and his siblings with food and shelter.[7]  PSR ¶ 87-88.  As a

consequence, Mr. Lam suffered from malnourishment and hunger, and nearly died as a

young child because of inadequate medical attention.  Leung Rpt. at 8.

---

[7] Mr. Lam's family's living conditions deteriorated rapidly after communist forces took over their village.  PSR ¶ 88.  The family lived in a home that housed 16 people and was made of cement, with an aluminum roof, and had no plumbing or electricity.  *Id.*  His family was also "targeted for persecution and oppression."  Leung Rpt. at 3.

When Mr. Lam was 10 years old, his family fled Vietnam for a refugee camp in Thailand.  PSR ¶ 82.  Approximately six months later, Mr. Lam and his family legally immigrated to the United States and settled in Montgomery County, Maryland.  *Id*.  His father soon gained employment as a janitor after the family arrived in the United States. The family was poor and lived in small, cramped apartments for many years.  PSR ¶ 83. As the oldest child, Mr. Lam often assisted his mother in watching over his younger siblings while his father worked a variety of jobs.  One of Mr. Lam's sisters, Kim Nhung Lam, has submitted a letter stating that Mr. Lam helped his younger siblings with school work and often babysat his younger brother and sisters.  Exhibit C, Letter of Kim Hung Lam.  Mr. Loc T. Lam, Mr. Lam's younger brother, also submitted a letter detailing how Mr. Lam always supported him when they were younger and encouraged him to join the military.  Exhibit C, Letter of Loc T. Lam.

The transition to American society was a difficult one for Mr. Lam.  Soon after his arrival, he enrolled in public school.  He struggled in school both academically and socially because he could not speak English and had no friends with a similar cultural background.  Dr. Leung, whose specializes in psychological issues associated with the assimilation of Asian immigrants into American society, concluded that Mr. Lam's immigration experience contributed to a low assessment of his own self-worth which continues to this day.  *See* Leung Rpt. at 8.  Mr. Lam's inability to "fit in" as an adolescent immigrant eventually led him, during his high school years, to seek refuge

with other disaffected Vietnamese immigrants who were often bad influences.  As Dr.

Leung explains in his report:

> After coming to America, the assimilation process was a long and hard one
> for Hung Lam.  When he was in elementary school as well as junior high
> Hung Lam was targeted by his fellow schoolmates for teasing and
> harassment.  He was not able to fend for himself because he lacked the
> English language capability. . . .   His parents were of no help because they
> were in a poorer condition to gain mastery of the new language and the new
> culture.  Individuals like this would grow up to be adults who always felt
> secondary to others and unable to match up.  Hung Lam's way of remedy
> was hanging out with people like him of similar background even though
> knowing that these were not upwardly mobile students in good standing.
> As a matter of fact, these were students in high school who likely were
> involved in drugs, alcohol, petty theft, and later on more serious crimes.
> However, these were the people who offered him a sense of belonging and
> a sense of self-worth.

Exhibit A, Leung Rpt. at 8.

Although Mr. Lam has great respect for his parents and how hard they worked to

make a life for his family in America, they – like Mr. Lam – struggled to establish

themselves socially and culturally in America.  Their struggles had a direct impact on Mr.

Lam.  For example, they – like Mr. Lam – had difficulty learning English and, as a result,

could not communicate with Mr. Lam's school teachers or help Mr. Lam with his school

work.  PSR ¶ 84; Leung Rpt. at 7.  Mr. Lam's parents also had difficulty adjusting to

mainstream American society, which hindered their parenting abilities – especially their

ability to relate to what their children were experiencing.  Indeed, they also were

ostracized by others, including their own extended family.[8]  Dr. Leung stated in his report

that Mr. Lam's parents were unable to provide the kind of close supervision Mr. Lam

needed during his difficult teenage years: "[i]t is my opinion that, during these very

important formative years of an individual's life, if Hung Lam had adequate supervision

and monitoring by capable parents he would not have turned himself even deeper into the

lifestyle of a criminal and a drug addict."  Leung Rpt. at 10.

    Mr. Lam's sense of alienation and low self worth led him to drop out of high

school during his senior year.  Instead of going to school, he would spend time with other

disaffected Vietnamese males with similar backgrounds.  He also addressed his sense of

alienation by, at the age of 19, joining a Vietnamese street gang known as the

"Vietnamese Pride."  PSR ¶ 84.  The gang gave Mr. Lam something that was lacking

from his experience in middle and high school – a sense that he belonged and that others

respected him.  PSR ¶ 84.  According to Dr. Leung, Mr. Lam used his association with

the gang – and the affirmation he gained from his peers in the gang – to mask his

insecurities stemming from his failure to succeed in school and his family's isolation from

mainstream American society.[9]  Leung Rpt. at 10.

_____

    [8] In part because of the Lam family's poverty and the menial jobs (e.g., janitor)
held by Mr. Lam's father, Mr. Lam's extended family "were not friendly to his parents"
and "would criticize" them.  Leung Rpt. at 3.

    [9] Dr. Leung states in his report that "[i]t was not difficult to imagine that Hung
Lam most of the time was left to fend for himself and that was a really depressing
situation for a young boy.  From high school years onward, underneath a facade of a
tough guy enjoying a great deal of popularity among his peers, there was a very insecure

Mr. Lam also resorted to drug use in an effort to fit in with his peers.  This drug use began early on as experimentation with marijuana while "hanging out" with his friends.  Later, and in association with his friends, Mr. Lam tried crack and power cocaine.  By age 21 he had developed a full-blown addiction to crack and cocaine, which he would sometimes use as often as twice a week.  PSR ¶ 95.  Mr. Lam never received treatment for this addiction.  He estimates that he regularly used crack and cocaine from the age of 21 until his arrest for the instant offenses in May, 2009.

Significantly, Mr. Lam used cocaine and crack only when he was spending time with his friends – and never when he was at home.  *See* Leung Rpt. at 10.  In fact, Mr. Lam concealed his drug addiction from his wife for many years, as he would stay away from his wife and children when he was getting high with his friends.  *Id.* at 5-6.  Indeed, Dr. Leung notes in his report that, when Mr. Lam would "crash" or come down from a drug-induced high, he would become fearful that his wife would discover his addiction and leave him.  *Id.* at 4.  Dr. Leung also states in his report that Mr. Lam's addiction to drugs substantially impaired his judgment during the time period of the offenses at issue in this case.  *Id.* at 10.

---

individual who did not really know what he was doing but to follow the trend in order to get approval by the only support group that he had although mostly composed of young criminals and drug addicts of the not-so-glorified side of the Vietnamese community in the Washington, D.C. area."  Leung Rpt. at 10.

Mr. Lam married his wife, Ms. Hanh Diep, on April 6, 1996.  They have two children, N.L. (age 13) and D.L. (age 9).[10]  Mr. Lam is devoted to his children and, despite his addiction to drugs, has worked hard to be a good father to them.[11]  Mr. Lam's wife, Ms. Hanh Diep, submitted a letter detailing how Mr. Lam "lives" for his children and always made them do their homework.  Exhibit C, Letter of Hanh Diep.  Mr. Lam's family is equally devoted to him.  Notwithstanding Mr. Lam's troubles, Ms. Diep is committed to her husband and told the probation officer that she will wait for him no matter how long he is in prison.  PSR ¶ 92.  Ms. Diep's letter to the Court likewise reflects her strong support for her husband.  Exhibit C, Letter of Hanh Diep.  Indeed, the surfacing of the defendant's hidden life and his commitment to putting that life behind him has rejuvenated his marriage.  Ms. Diep has repeatedly expressed to defense counsel that, in the relatively short time Mr. Lam has been incarcerated since his arrest, she has seen a big change in his mental health, which she attributes in large part to the fact he is no longer using drugs or spending time with his former friends.  She believes Mr. Lam has already begun a healing process and is committed to helping him through that process so that he can rejoin the family.

---

[10] Both children have submitted letters to the Court in support of their father.  *See* Exhibit C, Letters of N.L. and D.L.  The PSR identifies them by their Vietnamese names (abbreviated A.L. and P.L.), whereas they identify themselves using their American first names (N.L. and D.L.) in their letters.  *See* PSR ¶ 89.

[11] In his letter to the Court, Mr. Lam details the importance of his wife and children in his life.  *See* Exhibit D, Letter of Hung Tan Lam.

Although Mr. Lam deeply cherishes his family and their support, his former family life also fueled his low self-esteem, which in turn contributed to his criminal conduct. Mr. Lam comes from a culture where the husband is expected to be the leader of the family and where the eldest son is supposed to make his family proud.  However, since they have been married, Ms. Diep has been the family's bread winner and primary source of income,[12] while Mr. Lam has struggled to maintain consistent employment.[13]  This has caused tension in their marriage.  *See* Leung Rpt. at 9.  Ms. Diep informed Dr. Leung that, because of his lack of professional success, Mr. Lam has never been proud of himself and that he has told her on several occasions that he is a "loser."  *Id*. at 5.  Dr. Leung explains in his report that Ms. Diep's successful career, combined with Mr. Lam's failure to maintain steady employment, exacerbated his already low self-esteem.  *Id.* at 9.  Mr. Lam saw himself as so ineffectual and isolated at home that – much like his reaction to his failures in high school – he sought out friends who were negative influences.  *Id.*  Dr. Leung notes in his report that these friends temporarily relieved Mr. Lam's sense of

---

[12] Ms. Diep is a finance manager at a major auto dealer in the Washington, D.C., metropolitan area.  She has held finance positions at various area auto dealerships for the past 12 years.  PSR ¶ 89; Leung Rpt. at 9.

[13] Mr. Lam has worked in a number of different jobs since dropping out of high school.  Immediately after high school, he was employed for approximately three years at a factory in Fredericksburg, Maryland, that manufactured solar panels.  PSR ¶ 106.  After that, and as his drug addiction problems worsened, his employment was less consistent.  He worked for some time at a shipping company in Maryland.  *Id.* ¶ 105.  More recently, he has maintained relatively consistent employment at his father-in-law's nail salons.  From approximately 2003 until his arrest in 2007, he worked as a nail technician and store manager at his father-in-law's nail salons.  *Id.* ¶ 104.

worthlessness by providing him with respect, even if that respect had to be earned by using drugs and engaging in criminal conduct. *Id.*

In sum, Mr. Lam's life since coming to America as a 10-year-old, non-English speaking Vietnamese immigrant has been a series of hardships that were made worse by his bad decisions. Cultural and language barriers impeded Mr. Lam from making friends in junior high and high school. After years of struggling to fit in, Mr. Lam's first and most loyal support network consisted of similarly disaffected young Vietnamese males who promoted drug use and criminal activity. As Mr. Lam got older and married a successful woman, his sense of shame and low self-esteem grew. In his mind, he was less of a man because he could not provide for his wife and children. Leung Rpt. at 9. Unfortunately, time and time again Mr. Lam turned for support to his "friends" who encouraged and reinforced bad behavior.[14] It was these friends that Mr. Lam conspired with – often while high on drugs – to engage in the offenses at issue in this case. As explained below, having been removed from these individuals and from drugs, Mr. Lam now realizes that his former confederates provided him with a false sense of security and that he made terrible choices in an effort to mask his own insecurities.

---

[14] Mr. Lam readily admits that his – and not his "friends'" – bad choices are what led to his convictions in this case. He does not intend to diminish his acceptance of responsibility through his explanation of his upbringing and life experiences. He respectfully submits, however, that his upbringing, life experiences, and drug addiction help explain his conduct and should be taken into account in determining an appropriate sentence.

C.     The 3553(a)(2) factors.

The basic mandate of § 3553(a) requires that district courts impose a sentence that is "sufficient, but not greater than necessary," to comply with the four purposes of sentencing set forth in § 3553(a)(2): retribution (to reflect the seriousness of the offense, to promote respect for the law, and to provide "just punishment"); deterrence; incapacitation ("to protect the public from further crimes"); and rehabilitation ("to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment").  In weighing these factors, the Court should consider the following aspects of Mr. Lam's case, which are not adequately accounted for in his Guidelines calculation:

First, a contributing factor in his commission of the offenses is Mr. Lam's opinion of himself as a failure.  Mr. Lam's sense of inadequacy and low self-esteem are direct results of his (1) traumatic upbringing in Vietnam, including his family's persecution and oppression there; (2) unsuccessful assimilation to the United States, including the teasing and harassment he suffered at school and elsewhere because of his ethnicity and lack of English-speaking ability; (3) dysfunctional family environment, which included parents who could not speak English and were unable to help him address his many complex emotional and mental health issues; (4) extended family, which ostracized him for his parents' low status, poverty and menial employment; and (5) dysfunctional marriage to a Vietnamese woman who reinforced his low self-esteem and put demands on him

(common in the Vietnamese culture) to behave like the stereotypical elder Vietnamese male child.  *See generally* Leung Rpt. at 8-11.  These feelings are obviously not a excuse for Mr. Lam's criminal conduct.  They do, however, help *explain* his conduct and why such a promising and intelligent young man would commit the serious offenses to which he has pled guilty.

Second, the attractive lure and pull of other disaffected Vietnamese men, particularly his confederates in this case, also contributed to Mr. Lam's commission of the offenses.  The influence these men had on Mr. Lam cannot be overstated.  They filled the vacuum created by Mr. Lam's low self-esteem with feelings of pride, loyalty and family.  These otherwise positive virtues were then corrupted in Mr. Lam's mind to countenance the commission of armed robberies, drug use, and other criminal acts.  Again, the *decision* to commit these acts was Mr. Lam's, but the insidious influence of the other gang members – members who outwardly professed to be Mr. Lam's closest friends – is a mitigating factor in this case.

A third contributing factor is Mr. Lam's severe drug addiction during the time of the instant offenses.  PSR ¶ 95-98; Leung Rpt. at 10.  That addiction was fueled in part by Mr. Lam's low sense of self-worth and depression, and his association with fellow gang members who encouraged rampant drug use.  Leung Rpt. at 4.  Mr. Lam has a more than fifteen year history of using alcohol, cocaine powder, crack cocaine, ecstasy, and marijuana.  PSR ¶¶ 95-98.  In Dr. Leung's opinion, Mr. Lam's "judgment was totally

impaired when he was under constant influence [of these drugs] that can bring on psychosis." Leung Rpt. at 10.  The effect of this impairment was that Mr. Lam "would engage in criminal activities . . . without regard for the consequences of his actions." *Id*. at 10.

Fourth, the available evidence strongly suggests that at the time of the offenses and before, Mr. Lam was clinically depressed, a condition that was caused by the "ongoing mental and emotional disturbances [he experienced] throughout his life." Leung Rpt. at 10.  One way Mr. Lam dealt with his depression was to "[seek] approval [from] the only support group that he had," namely, "young criminals and drug addicts of the not-so-glorified side of the Vietnamese community in the Washington, D.C. area." Leung Rpt. at 10.  A diagnosis of depression is a mitigator because it, like the other factors previously discussed, helps explain how a youth brought to this country with such promise could engage in such destructive behavior.

Fifth, Mr. Lam's most recent actions and current state of mind establish the sincerity of his remorse and the lessened risk that he will recidivate once he is released back into the community.  Since his arrival in Alexandria for the instant charges, Mr. Lam has dramatically changed his outlook and priorities, and as a result is less likely to recidivate.  For example:

a.      Mr. Lam has admitted the depths of his depression and drug addiction to his wife and family.  He told Dr. Leung that he was "grateful" for his

incarceration because it had allowed him time to purge his body of illegal drugs and "giv[en] him time to seriously contemplate the direction that he needs to take in the future."  Leung Rpt. at 11; *see also* PSR ¶ 97 (noting that Mr. Lam admitted his mind has been "100 percent pure and clear" since his arrest).

b.    Mr. Lam has also severed his ties to his former "friends" and co-conspirators.  As noted above, Mr. Lam's confederates often were the only ones who provided him with a sense of self-worth.  He now realizes their friendship provided him with a false sense of security.  Mr. Lam's incarceration has allowed him the space he needed to understand that his loyalties to his co-conspirators was misplaced and that he must admit his conduct to begin the healing process with himself and his family.  The fact that Mr. Lam is no longer using drugs and has disavowed his former friends substantially reduces the chance of recidivism, given that these were two significant contributors for his criminal conduct.[15]

---

[15] Mr. Lam's desire to make amends for his conduct extends to his commitment to provide information to the government regarding these individuals.  Mr. Lam had the option of simply pleading guilty and not cooperating with the government.  Instead, he made the decision to provide the government with information on people who had often been his only source of support.  While there is, of course, the possibility (but no guarantee) that Mr. Lam will receive a sentence reduction for his cooperation, the fact that he made the decision in the first place should be taken as evidence of the level of commitment to his recovery and his desire to sever ties with his former "friends."

c.     Mr. Lam's family support (and their recent awareness of the depth of his

problems) also greatly diminishes the chance of recidivism.  Mr. Lam

comes from a Vietnamese culture that looks down upon any conduct that

could bring shame to one's family.  This culture made it especially difficult

for Mr. Lam to confess to his family his drug addiction and his feelings of

worthlessness.  However, now that he has pled guilty, those problems (and

his criminal conduct) are no longer hidden from his family, most especially

his wife.  Mr. Lam's family, including his wife, has responded to his guilty

plea with overwhelming support.[16]  Although saddened by his conduct, his

family – much like Mr. Lam – has already shown that they are committed to

supporting him.  Having admitted his past mistakes and drug problems to

them, Mr. Lam can now rely on his family for support in a way that he

thought was impossible before his arrest.

d.     Mr. Lam's family also is in a position to provide him with employment

upon his release.  Mr. Lam has relatives who own small business and could

employ him after he serves his sentence.[17]  *See* PSR ¶ 103.  Thus, the fact

that Mr. Lam's family is emotionally and economically supportive, and the

---

[16] The depth of the family's support for Mr. Lam also is evidenced by the fact they submitted 15 letters on his behalf.  *See* Exhibit C.

[17] Prior to his arrest for the instant offenses, Mr. Lam worked at his father-in-law's nail salon.  PSR ¶ 103.  He is likely to be able to resume working there upon his release.

fact that they are now fully aware of his problems and are willing to help, substantially decreases the likelihood of recidivism in this case.

e.     Finally, Mr. Lam's efforts to make amends includes his recognition of the harm he inflicted on the victims of the offenses.  His letter to the Court, attached as Exhibit D, expresses his remorse and "the pain I have caused the victims."  He also has agreed to pay full restitution for their losses.  PSR ¶ 7.  Finally, Mr. Lam (for the first time) recognizes that he needs treatment for his drug addition and mental health issues.  In that regard, he asks the Court to recommend his placement in the Bureau of Prison's ("BOP") 500-hour residential drug abuse program so that he can receive treatment while in custody.

Sixth, a sentence of 120 months would be far more substantial than any punishment Mr. Lam has ever received in his life – and thus would be sufficient to deter him from future criminal conduct.  Prior to his arrest in this case, Mr. Lam had spent a total of 1 year and 60 days in jail.  PSR ¶¶ 62, 65.  The vast majority of that time (1 year) occurred approximately fifteen (15) years ago, while Mr. Lam was still a teenager.  (He is now thirty-five years old.)  A sentence of 120 months is many times more than Mr. Lam has served for all the prior offenses in his life combined – and therefore would have a substantial deterrent effect not accounted for by his Guidelines range.  *See United States v. Mishoe*, 241 F.3d 214, 220 (2nd Cir. 2001).  In *Mishoe*, the Second Circuit recognized

that a large disparity between a defendant's prior sentences and potential sentence

provides a deterrent effect that is not accounted for by the Guidelines.  *Id*. at 220

(considering a criminal history category reduction on the basis that it overstated the

seriousness of the offense and noting "if a defendant served no time or only a few months

for the prior offenses, a sentence of even three or five years for the current offense might

be expected to have the requisite deterrent effect").  In this case, a sentence greater than

120 months would "provide[ ] a deterrent effect so in excess of what is required as to

constitute a mitigating circumstance present to a degree not adequately considered by the

[Sentencing] Commission." *Id.* (citation and internal quotation marks omitted).

A 120-month sentence also would promote general deterrence.  A decade-long

sentence sends a clear message to others (in the Vietnamese community or elsewhere)

that the conduct at issue here will be met with strong punishment.

Seventh and finally, the Guidelines do not adequately account for the strong

possibility that Mr. Lam will be deported following service of his sentence.  Mr. Lam is

not a United States citizen.  PSR at 3.  Thus, as a result of his conviction in this case, it is

possible that he will be removed from the country.  Deportation, of course, would be a

substantial punishment given Mr. Lam's close relationship with his family.  Moreover,

the mere fact that deportation is a possibility is itself a sanction – as Mr. Lam will have to

live with this risk for the rest of his life.  This risk already weights heavily in Mr. Lam's

mind and will continue to be a major concern (and source of uncertainty) through

whatever period of incarceration the Court imposes.  Mr. Lam realizes that he brought this risk upon himself.  However, he respectfully submits that this risk is a form of punishment and is not taken into account by the Guidelines.

The possibility of his removal also impacts the § 3553(a)(2) factor "to protect the public from further crimes of the defendant."  *See United States v. Ramirez-Ramirez*, 365 F. Supp. 2d 728, 733 (E.D. Va. 2005) (Lee, J.) (noting the decreased need to protect the public from further crimes of the defendant when he "will ultimately be removed and sent out of the country"); *United States v. Biheiri*, 356 F. Supp. 2d 589, 603 (E.D. Va. 2005) (Ellis, J.) (observing that the goal of protecting the public was "of little import" where the defendant was going to be deported to Egypt immediately following his release from custody).

In sum, a below-Guidelines sentence of no more than 120 months imprisonment for both Counts is enough to reflect the seriousness of the offense, promote respect for the law, provide a just punishment, and protect the public from further crimes of the defendant.  Such a sentence is appropriate given Mr. Lam's traumatic upbringing which resulted in feelings of inadequacy and low self-esteem; the attractive lure and pull of other disaffected Vietnamese men and the negative influence they had on Mr. Lam; Mr. Lam's severe drug addiction and how that addiction impaired his judgment; the effect Mr. Lam's depression had on his decision to commit the offenses; the sincerity of Mr. Lam's remorse, including his breaking ties with his former gang members and his on-going

cooperation against them; the lessened risk of recidivism given Mr. Lam's dramatically

changed outlook and priorities, including the rejuvenation of his family/marital

relationships and his admission to his family of the true extent of his conduct and

problems; the significant punishment that a 120 month sentence entails and the

diminished risk that he will recidivate given the enormous amount of prison time he will

serve relative to his past sentences; and the lessened need to protect the public given the

strong possibility that he will be removed from the country.

CONCLUSION

For the reasons stated above, Mr. Lam respectfully requests that the Court impose

a sentence of no more than 120 months imprisonment and not impose any fine or costs

given his indigence.  Alternatively, Mr. Lam asks that any period of imprisonment not

exceed the low-end of the Guidelines range (141 months), which the government does not

oppose.

Mr. Lam also asks that the Court credit him for time he served in Maryland

custody for the instant offense.  Officers with the Montgomery County Police Department

arrested Mr. Lam on May 27, 2009, for one of the robberies described in the Statement of

Facts.  *See* PSR ¶¶ 26, 47, 69; SOF ¶ 6.  Mr. Lam was arrested on September 22, 2009,

for the charges alleged in the indictment and transferred to federal custody.  PSR ¶ 2.

Between May 27, 2009, and his arrest on September 22, 2009, Mr. Lam served 86 days in

state custody for the same conduct to which he pled guilty in this case.[18]  Given that Mr.

Lam has served 93 days in state custody as part of the instant offense, that time should be

credited to him by way of a reduction in the sentence the Court imposes in this case.

Providing Mr. Lam with this credit is warranted because federal authorities were working

in conjunction with Maryland officials at the time of Mr. Lam's May 27, 2009 arrest and

the arrest was for the same conduct to which he pled guilty.

Finally, Mr. Lam requests that the Court recommend his placement in the BOP's

500-hour residential drug abuse program and his designation to a BOP facility close to his

home in Germantown, Maryland.

Respectfully submitted,

HUNG TAN LAM
By Counsel

_____/s/_____

Kenneth P. Troccoli
Virginia Bar Number 27177

---

[18] Mr. Lam was incarcerated every day between his arrest on May 27, 2009 and his transfer to federal authorities on September 22, 2009.  For a portion of this time (between June 26, 2009 and July 27, 2009) he was incarcerated in Montgomery County for a charge unrelated to this case, namely, driving on a suspended license.  *See* PSR ¶ 65.  For the remainder of the time between May 27, 2009, and September 22, 2009, he was incarcerated in St. Mary's County for the December 10, 2004 robbery described at paragraph 6 of the Statement of Facts.  Excluding the time Mr. Lam spent in Montgomery County (32 days), he spent a total of 86 days in Maryland custody prior to being transferred to federal custody.

Attorney for the defendant
Assistant Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0870 (telephone)
(703) 600-0880 (fax)
Kenneth_Troccoli@fd.org (e-mail)

Jeffrey C. Corey, Esq.
D.C. Bar No. 980384
Pro Bono Co-Counsel for the defendant
Hunton & Williams, LLP
1900 K Street, N.W.
Washington, D.C. 20006
(703) 600-0859 (telephone)
(703) 600-0880 (fax)
jcorey@hunton.com (e-mail)

CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2010, I will electronically file the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Kimberly Riley Pedersen, Esq
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria , Virginia 22314
(703) 299-3700
Kimberly.Riley.Pedersen@usdoj.gov

Daniel Tomas Lopez, Esq.
Lopez Meleen & Sprano PLC
10623 Jones Street, Suite 301A
Fairfax, Virginia 22030
(703) 591-1399
Dlopez@lmslaw.org

Juan Ever Milanes, Esq.
Law Offices of Juan E. Milanes, PLLC
1831 Wiehle Avenue, Suite 105
Reston , Virginia 20190
(703) 880-4881
Ecf.milaneslaw@gmail.com

Pursuant to the Electronic Case Filing Policies and Procedures, a courtesy copy of the foregoing pleading will be delivered to Chambers within one business day of the electronic filing.  A courtesy copy will also be delivered by inter-office mail to Senior U.S. Probation Officer Mary Beth Simpson, Third Floor, 401 Courthouse Square, Alexandria, Virginia.

/s/
Kenneth P. Troccoli
Virginia Bar Number 27177
Attorney for the defendant
Assistant Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0870 (telephone)
(703) 600-0880 (fax)
Kenneth_Troccoli@fd.org (e-mail)

-28-